**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Harvey R. BITTER, Defendant-Appellant.**

**No. 15494.**

United States Court of Appeals Seventh Circuit.

Feb. 6, 1967.

Rehearing Denied April 20, 1967.

Schnackenberg, Circuit Judge, dissented.

Ray T. McCann, Richard A. McDermott, Milwaukee, Wis., for appellant.

James B. Brennan, U. S. Atty., Robert J. Lerner, Franklyn M. Gimbel, Asst. U. S. Attys., Milwaukee, Wis., for appellee.

Before SCHNACKENBERG, KNOCH and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Defendant Harvey R. Bitter was convicted, after trial before the court without a jury, on seven counts charging use of the mails to execute a scheme to defraud.[1] He has appealed, claiming (1) that the evidence was insufficient to establish guilt beyond a reasonable doubt, (2) that the court erroneously refused to consider certain evidence, (3) that the court erroneously denied an inspection of grand jury minutes, and (4) appellant was deprived of assistance of counsel.

Bitter is a real estate broker and business opportunity broker. He carries on substantial business activity at Milwaukee. The indictment contained 18 counts, each relating to a transaction between Bitter and the owner or owners of a different business. Each count charged him with mailing a letter to the owner for the purpose of executing a scheme to defraud, which was alleged in the same terms in all counts. In essence, the pattern of the scheme was described as follows: Bitter would write to the owners of a business, after obtaining the names from newspaper advertisements, would solicit the owners to employ him to advertise the business and obtain a buyer. He would induce the sellers to make an advance payment of selling fee, but would not perform the services promised, and would not advertise the business as represented, and would refuse to make refunds. He would falsely represent that the business would be advertised in various newspapers whereas he

---

1. 18 U.S.C.A. § 1341.

knew that few if any advertisements would be run; that the business was sure to be sold as a result of his services; that the business would sell for a much higher figure than the seller's proposed price; that if the business was not sold within a certain time, the money would be refunded; that he already had a buyer; that he and his salesmen would take an active part in making the sale.

One count was dismissed on motion of the government because the owner was unable to appear. Ten counts were dismissed because the court deemed they had not been proved beyond a reasonable doubt.

The seven counts on which the court found defendant guilty may be summarized as follows:

Count 8. Mr. and Mrs. Ebelt had a sheet metal and plumbing business at Cascade, Wisconsin. After advertising their business for sale, they received letters from Bitter, one of which represented he had an interested buyer. They came to see Bitter in Milwaukee and signed an agency agreement. They wanted $25,000, but Bitter said it should be $30,000. They paid him $250 as requested. Bitter said very positively the business would be sold and they would get their money back at that time. Bitter telephoned once and made an appointment to show the business, but no one came. They never saw Bitter again, nor any salesmen nor prospects.

Count 10. Carrol Fraundorf had a furnace-cleaning business at Hartford, Wisconsin. Bitter told him he would have to pay $150 to start with, and Bitter's salesmen would work on the sale. Fraundorf paid, and signed an agency agreement, but no salesmen nor prospects ever came.

Count 12. Leo Gremminger was a butcher at Campbellsport, Wisconsin. After advertising his business, he received letters from Bitter, saying that Bitter knew of his business and could make an immediate sale of it. He came to see Bitter, who said Bitter had buyers. He signed an agency agreement and paid $300. He never saw Mr. Bitter again, nor any salesmen from Bitter's office, nor any prospects.

Count 15. Ervin Leichtle had a bowling alley and soda fountain at Rio, Wisconsin. After advertising his business, he received a letter from Bitter telling him to come in. Bitter told him he had people who were looking for a business like that. Leichtle signed an agreement and paid a fee of $300. Bitter made an appointment to show the business, but no one appeared. No one ever came from Bitter's office. Bitter explained that the $300 was to pay for Bitter's trouble if Leichtle should refuse to sell to a buyer produced by Bitter.

Count 16. Mr. and Mrs. Schaefer had a small shoe store at Columbus, Wisconsin. Shortly after they advertised their business, they received letters from Mr. Bitter, the second indicating Bitter had a buyer who was very much interested in their type of business. They came to see Bitter and signed an agency agreement. They paid $250. Bitter said this was to cover considerable advertising. They never again saw Mr. Bitter, nor any of his salesmen, nor any prospects.

Count 17. Mrs. Fae Weber had an upholstery and drapery shop at Pewaukee, Wisconsin. After advertising her business for sale she received a letter from Bitter, and came for an interview. Bitter assured her he could sell it and would use the $150 deposit he demanded to take care of costs of advertising. She signed and paid. She never again saw Mr. Bitter nor any salesmen, any prospects, nor any advertisements. She wanted $12,000. He added $5,000 for his commission, so that the selling price agreed on was to be $17,000.

Count 18. Harvey Wellnitz had a store at Gillett, Wisconsin. After advertising it for sale, he had letters from Bitter, as a result of which he came to see Bitter at Milwaukee. Bitter said he had cash buyers, one right then in mind. Wellnitz signed an agreement and paid $250. He never saw Mr. Bitter again, nor any salesmen, nor any prospects. He did receive letters, apparently in response to his inquiries, in which

Bitter mentioned people who were interested.

### Sufficiency of Evidence

There was other testimony from which it could reasonably be inferred that Bitter did not use the agency agreement—advance payment pattern with all his clientele, but reserved it for those he considered gullible, "wearing fins," as he expressed it to one of his salesmen, and that he routinely, in letters to owners of this type of business, falsely represented that he had considerable familiarity with their respective businesses, in order to lure them into his office. It appears that he neither did nor intended to make expenditures for advertising these particular businesses, nor to provide other services, at all commensurate with the payments received.

Although the agency agreements provided clearly enough that the payments would not be refunded, the fraud lies in the representations by which such payments were induced.

█ In our opinion the record contains evidence from which the court could find, beyond a reasonable doubt, that Bitter, following a pattern or scheme, consisting of false assurances and innuendoes, conveyed in part by mail, lured people in and induced them to believe he would perform services he did not intend to perform, and to pay him money in reliance upon such misrepresentations.

In arguing that the evidence is insufficient, defendant points out that he has built a substantial sales agency over a period of 25 years, dealing in business opportunities and real estate, that the procedures involved in the counts dismissed by the court were generally similar to those in the counts where a finding of guilt was made, and that Bitter caused the businesses of the complaining witnesses to be made available to salesmen in Bitter's office on the same basis as other listings. None of these facts, in our opinion, prevent, as a matter of law,

a finding of guilt on the particular counts where such finding was made.

Defendant also proved that during the period covered by the indictment he had spent, in connection with his entire business, almost $22,000 for advertising and more than $8,000 for telephone service. Defendant appears to have carried on a very substantial business as real estate and business opportunity broker. Much of it did not involve the pattern of conduct under scrutiny here. No attempt was made to prove the amount of money he spent to advertise the businesses involved in this case, nor those where the pattern of conduct was similar. It seems to us that the figures significant in the defense of this case would be the ones just referred to. It does appear that he placed a few tiny ads mentioning the businesses involved in this case, but their cost was surely nominal when compared to the advance payments exacted.

### Limitation on Evidence Offered by Defense

Defendant points out that in prosecutions under this statute, transactions by a defendant not involving fraud but otherwise similar to those on which the government bases its claim of a scheme to defraud have been deemed relevant on the question of whether there was a scheme involving an intent to defraud.[2] He claims that certain rulings and directions of the court improperly limited his proof.

█ The record suggests that defendant intended to prove that he had been in business many years, and had concluded many deals to the satisfaction of his patrons. It was this very general line of proof which the district court declined to hear. There was no offer to prove that there were transactions involving the exaction of advance payments, as here, in which defendant incurred expense commensurate with the advance payments, or in which the ultimate outcome was favorable to the customer. Proof of otherwise similar transactions

---

2. Worthington v. United States (7th Cir. 1933), 64 F.2d 936, 940; United States v. Shavin, (7th Cir. 1961), 287 F.2d 647, 653, 90 A.L.R.2d 888, 901–902.

which did not involve fraud might tend to show that the losses suffered in the instant cases were accidental or incidental rather than the product of a designed scheme, but defendant is not in a position to claim that the court excluded such proof.

### Denial of Inspection of Grand Jury Minutes

Defendant was first indicted July 10, 1964. There were motions, and apparently the government conceded the indictment was defective. On September 1, the United States Attorney wrote the court stating that a new indictment would be presented to the grand jury, and predicting it would be substantially the same as the first. The new indictment was returned September 2 by a different grand jury. Defendant moved to dismiss the indictment, and for inspection of the minutes.

■ He has shown the probability that the grand jury did not hear testimony from the owners of the businesses involved in the 18 counts. The grand jury may, however, have considered reports, statements, or other information which would not be competent upon the trial. An indictment cannot be challenged, however, upon the ground that all the evidence before the grand jury was hearsay.[3]

■■ The mere possibility that the indictment was not the work of the grand jury, as it purported to be, or that the grand jury had no information upon which to base it is insufficient to show an abuse of discretion in denying the opportunity to inspect the minutes. The defense has the burden of showing a particularized need for inspection.[4]

### Confinement of Defendant During Part of Trial

The trial began Monday, August 23, 1965. The government rested its case early in the afternoon session on Wednesday, August 25. Defendant began to testify in his own behalf. After a short period a recess was taken for about 45 minutes to permit defendant to obtain records from his office. Court was to resume at 3:45 p. m., but defendant returned at 4:20 p. m. The court then said: "The defendant's arrival 37 minutes late has interrupted and disrupted the trial of this case and the court's work. I direct that the United States Marshal, when court recesses for the evening, take the defendant in custody and keep him in custody throughout the trial of this case." Attempts by counsel to offer explanation were rebuffed, and Bitter was held in custody, including the overnight recesses on Wednesday and Thursday. The trial concluded Friday.

Defendant claims that his "incarceration effectively terminated any opportunity for effective counsel and preparation throughout the balance of the trial." He emphasizes that because of overcrowding at the jail at Waukesha, 20 miles from the place of trial, where persons in federal custody are ordinarily confined, defendant was lodged at Kenosha, some 40 miles away.

■ If the court's action be viewed as punishment for criminal contempt, we conclude that summary procedure was appropriate under the present circumstances.[5] The facts of the matter are clearly reflected by the record, although Rule 42, requiring a certificate and order of contempt, was not complied with.

■ It occurs to us, moreover, that holding a defendant in custody during trial to insure his presence is more remedial than punitive, and may be justi-

---

3. Costello v. United States (1956), 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397.

4. Pittsburgh Plate Glass Co. v. United States (1959), 360 U.S. 395, 400, 79 S.Ct. 1237, 3 L.Ed.2d 1323.

5. See Rule 42(a), Rules of Criminal Procedure, authorizing summary disposition where the judge saw the conduct, committed in the actual presence of the court. Here, of course, the gist of the offense was absence from court when required to be present.

fied on that ground if reasonably necessary to administer justice. It is evident that the court felt it was being imposed upon when defendant delayed proceedings in order to obtain documents which he should have known from the time of indictment, a year before, he would need for his defense.

■ Be these things as they may, however, and even assuming that the court's action was more severe than reasonably required by the circumstances, we find no reason to believe that defendant's defense was embarrassed or prejudiced in any way.

The record shows that no attempt at consultation during the night recesses was made by defendant or his counsel. Defendant was allowed to and did make telephone calls. He did not attempt to reach his attorney, and the attorney made no attempt to reach him. On Thursday morning, defendant was at the place of trial 35 minutes before court opened, but his counsel did not attempt to see him then. After court began, there was a short recess to permit consultation between defendant and counsel.

Defendant did produce, in support of his motion for arrest of judgment, several examples of advertisements mentioning the businesses involved, and claimed he could have produced these if he had been free to go to his office. The indictment alleged that he knew that few if any ads would be inserted, and his counsel had stated on opening argument that the proof would show he had done expensive advertising. It is incredible that his inability to look up these advertisements on Wednesday or Thursday night seriously prejudiced the defense he intended to make.

It does seem to us that the action of the district court was unnecessarily stringent, unless prompted to some extent by observations by the court of conduct or attitude not reflected by the record. We cannot conscientiously say, however, that it rendered the trial unfair under the circumstances.

The judgment appealed from is

Affirmed.

SCHNACKENBERG, Circuit Judge (dissenting).

Harvey R. Bitter, defendant, has appealed from a judgment of the district court convicting him, upon a trial without a jury, of using the United States mails for the purpose of executing a scheme and artifice to defraud and for obtaining money by false and fraudulent pretenses, in violation of Title 18 U.S.C. § 1341, as charged in counts 8, 10, 12, 15, 16, 17 and 18 of an indictment. By said judgment defendant was ordered imprisoned for a period of one year and a day and fined $500, on each count, said sentences to be served concurrently.[1]

On the trial before the court the government rested its case early in the afternoon of August 25, 1965.

Defendant was called as the first witness in his own behalf. He was examined by his own counsel on direct examination and then briefly cross-examined by government counsel. During further direct examination of defendant numerous documents were identified by him and a recess of court was taken until 3:45 o'clock to permit government counsel to inspect them and for the clerk to mark them. At the latter time defense counsel advised the court that, although he had instructed defendant to be in court at 3:45 o'clock, he had not arrived. After the court had waited 18 minutes for the appearance of defendant, he said to defense counsel "You may contact his office." Having left the courtroom for that purpose, defense counsel then returned and advised the court that defendant was "on his way back for more than 20 minutes * * * so we should be expecting him momentarily." Defend-

1. On motion of the government, count 14 was dismissed. On defendant's motion he was acquitted as to counts 3, 4, 5, 7, 9, 11 and 13. Defendant was found not guilty as to counts 1, 2, 6 and 19.

Prior to the return of the aforesaid indictment defendant had been named in a previous indictment which was dismissed after defendant had filed pre-trial motions thereto.

ant returned to the courtroom at 4:20 o'clock. Thereupon the court stated

"* * * defendant's arrival 37 minutes late has interrupted and disrupted the trial of this case and the court's work.

"I direct that the United States Marshal, when court recesses for the evening, take the defendant in custody *and keep him in custody throughout the trial of this case.*" (Emphasis supplied.)

It is contended by defendant's counsel that the fact that during the remainder of the trial [2] defendant was kept in custody effectively deprived his counsel of an opportunity to properly represent him during the remainder of the trial. This contention becomes more significant in view of the fact that, on oral argument in this court, government counsel admitted that during his confinement, as directed by the district judge, defendant was held in a Wisconsin jail at Kenosha, located about 40 miles from the federal courtroom in Milwaukee. Defendant's motion for a mistrial because of the entry of the aforesaid order was denied.

It is apparent to us that the action of the district court resulted in actually making difficult any contact between defendant and his counsel when the trial was not actually proceeding in the courtroom. This restriction necessarily substantially interfered with the opportunity traditionally enjoyed by counsel to discuss with his client the testimony offered by the government and the available use of proper evidence to be offered by way of defense. We agree with counsel for defendant that the suddenness of the order of confinement was an added impediment to an adequate defense. Unfortunately the punishment inflicted for

what the court deemed defendant's improper delay in reaching the courtroom resulted in not only the summary imprisonment of defendant but deprived his counsel of the usual opportunity for consulting with his client at or near the place where the trial was being conducted. The order of the court seriously invaded the constitutionally erected safeguards for the protection of the right of a defendant to consult with, and be assisted by his counsel.[3]

Accordingly I would reverse the judgment below and remand this cause for a new trial.

---

2. The order for confinement was entered on August 25, 1965 and the trial ended on August 27.

3. In addition, it may be pointed out that there was no compliance with rule 42 (a) of the Federal Rules of Criminal Procedure, which provides:

    (a) *Summary Disposition.* A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.