**UNITED STATES of America**

v.

**Robert Jay MEINSTER et al.**

**No. 79–165–Cr–JLK.**

United States District Court,
S. D. Florida.

Dec. 28, 1979.

---

Dana Biehl, Special Attorney, Washington, D. C.

Dennis J. Cogan, Philadelphia, Pa., for Robert Jay Meinster.

Arnold Stream, Monasch, Chazen & Stream, New York City, for Robert Elliot Platshorn.

Melvyn Kessler, Miami, Fla., for Lynne Platshorn.

Rebekah Poston, Miami, Fla., for Eugene Arter Myers.

Samuel Sheres, Hallandale, Fla., for Randall Gene Fisher.

Gerald Kogan, Miami, Fla., for Modesto Echezarreta-Cruz.

Michael Brodsky, Miami, Fla., for Richard Elliot Grant, Jr.

Arthur W. Tifford, Miami, Fla., for Mark Stephen Phillips.

Denis Dean, Miami, Fla., for Cari Jerry London.

## ORDER ON MOTIONS FOR RELEASE ON BOND

JAMES LAWRENCE KING, District Judge.

In the last few weeks this Court has been confronted with some of the most difficult issues which may arise in a criminal trial. Actually present for the Court's immediate consideration are motions by defendants Eugene Myers and Richard Grant for release on bond. However, these motions are enmeshed in the events of the last few weeks and cannot be considered in isolation.

This criminal trial involves an alleged criminal conspiracy to import and distribute vast quantities of marijuana over a three and a half year period. The indictment names twelve defendants, eight of whom remain in these proceedings. The Court briefly sketched the various charges of the one hundred page indictment [hereinafter, Indictment # 1] in a prior order. *See United States v. Meinster*, 475 F.Supp. 1093 (S.D.Fla.1979) (Order Denying Motions to Dismiss on Double Jeopardy Grounds).

Trial began on September 17, 1979. After three months, the government has closed its case and the most recent estimates by counsel for all parties indicate that the trial will conclude some time in early February. Lengthy trials of complex criminal cases are becoming commonplace in this district. *See United States v. Meinster*, 481 F.Supp. 1112 (S.D.Fla.1979) (Order Denying Defendants' Requests to be Absent from Trial).

Shortly before the trial began in this case, the Court revoked the appearance bonds of two other defendants, Robert Meinster and Robert Platshorn. After lengthy further hearings on bond revocation, the Court entered a twenty-one page Order on October 10, 1979 which detailed the grounds for continuing to hold defendants Meinster and Platshorn without bond. Based on extensive tape recordings and testimony, the Court concluded that both defendants were planning massive new drug deals and had made detailed arrangements to flee the country.

### I. The Precipitating Events

The motions now before the Court have their origin in events which first came to light on December 6, 1979. On that day, Mr. Atlee Wampler, the head of the Justice Department's Organized Crime Strike Force in Miami,[1] appeared before this Court to request (1) that the jury be sequestered, (2) that the Court open a sealed indictment which pertained to this trial and which had been handed down by a federal grand jury and (3) that the Court revoke the appearance bonds of various defendants, including Grant and Myers. The government's motions to sequester the jury and open the

1. The Strike Force Attorneys are entirely separate from the government trial team in this case. *See United States v. Meinster*, 478 F.Supp. 1131 (S.D.Fla.1979) (Order Denying Evidentiary Hearing on Prosecutorial Misconduct).

sealed indictment were granted[2] and an evidentiary hearing was begun on the issue of bond revocation.

The sealed indictment [hereinafter, Indictment # 2] charged four defendants[3] in this trial and three others with a conspiracy to "influence, obstruct, and impede trial proceedings" in this case in violation of 18 U.S.C. § 1503. Since December 6, yet another indictment [hereinafter, Indictment # 3] was disclosed which alleges that two of the defendants[4] and one of the jurors in this trial conspired to obstruct these proceedings, i. e. a separate conspiracy in which the juror was purportedly to be paid in an effort to influence the juror's vote in this case, again in violation of 18 U.S.C. § 1503. On the morning of December 7, 1979, after the evidentiary hearing the prior day and before Indictment # 3 was handed down by the grand jury, the Court excused from further service the individual juror who was eventually named in Indictment # 3.

At the conclusion of the December 6 evidentiary hearing, the Court remanded to custody Lynne Platshorn and Randall Fisher, the two defendants who were named in Indictment # 2 and who had hitherto been free on bond. The Court also revoked the appearance bonds of Grant and Myers, remanding them to custody. On December 12, 1979 Grant and Myers filed emergency motions for their release on bond, for a further hearing thereon, and for a written order on their motions. These are the motions now before the Court.

On Saturday, December 15, the requested hearing was held. In addition, in deciding these motions the Court has found it necessary to review the many hours of tape recordings presented in evidence. The present order constitutes the written order requested by the defendants. The Court agrees that the defendants deserve as complete an explanation of its decision as is possible.

## II. Standards for Revocation of Bond

### A. The Right To Bail

■ The eighth amendment of the constitution provides that "[e]xcessive bail shall not be required." The simplicity of this declarative clause belies the tremendous importance of the right to a reasonable bail for criminal defendants. At least two independent constitutional rights, and possibly the entire structure of the constitutional rights afforded criminal defendants, rely upon the right of a defendant to be free on bond pending a jury determination of guilt or innocence. See Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951); United States v. Abrahams, 604 F.2d 386, 393 (5th Cir. 1979) (dictum).

The two most important rights fostered by the availability of reasonable bail are (1) the constitutional guarantee that the defendant will be afforded a fair trial, a trial in which he or she can assist in his or her own defense; and (2) the due process and jury trial right which guarantees that criminal punishment will be inflicted only after a jury verdict. As the Supreme Court succinctly stated:

> This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. [citation omitted.] Unless this right to bail before trial is preserved,

2. On December 14, after the widespread media coverage which attended the in-court disclosures on December 6 had subsided, the Court permitted the jury to be released from sequestration. The release from sequestration followed unusually strict instructions to each juror.

3. Defendants Robert Meinster, Robert Platshorn, Lynne Platshorn, and Randall Fisher were named in Indictment # 2. Meinster and Robert Platshorn were in custody pursuant to the Court's Order of October 10, 1979. Lynne

Platshorn was free on bond following her plea of guilty to Count 20 of Indictment # 1. Randall Fisher was free on bond and attending the trial in this case.

4. The two present defendants charged in Indictment # 3 are Lynne Platshorn and Randall Fisher. The Strike Force has not ruled out the possibility that other defendants might be indicted in connection with this separate alleged conspiracy.

the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

*Stack v. Boyle,* 342 U.S. at 4, 72 S.Ct. at 3. These constitutional policies are implemented in the liberal provisions of Rule 46 of the Federal Rules of Criminal Procedure and in the Bail Reform Act of 1966, as codified at 18 U.S.C. § 3146.

■ Despite the weighty constitutional and statutory policies underlying the right to a reasonable bail, that right is not unconditional. *Stack v. Boyle,* 342 U.S. at 4, 72 S.Ct. at 3; *United States v. Abrahams,* 575 F.2d 3 (1st Cir. 1978). Most pertinent for the case *sub judice* are two conditions on bail. First, bail prior to and during trial is conditioned on the reasonable assurance that the defendant will in fact "stand trial and submit to sentence if found guilty" rather than fleeing the jurisdiction. *Stack v. Boyle,* 342 U.S. at 4, 72 S.Ct. at 3. *See also* Rule 46(b). Second, especially during the trial, bail is conditioned on the defendant refraining from conduct which would interfere with "the orderly progress of the trial and the fair administration of justice." *Fernandez v. United States,* 81 S.Ct. 642, 5 L.Ed.2d 683 (1961) (Harlan, J., sitting as Circuit Justice). *See also Bitter v. United States,* 389 U.S. 15, 16, 88 S.Ct. 6, 7, 19 L.Ed.2d 15 (1967) (*per curiam*); *Carbo v. United States,* 82 S.Ct. 662, 667–68, 7 L.Ed.2d 769 (1962) (Douglas, J., sitting as Circuit Justice); *United States v. Wind,* 527 F.2d 672, 674–675 (6th Cir. 1975); Rule 46(b).[5]

In a sense, these two conditions on bail are the criminal justice system's minimum prerequisites to ensure that the criminal justice system can function. Of course, releasing any criminal defendant on bail entails some risk that he will flee. In *Stack v. Boyle,* Justice Jackson stated:

Admission to bail always involves a risk that the accused will take flight. That is

a calculated risk which the law takes as the price of our system of justice.

342 U.S. at 8, 72 S.Ct. at 5 (separate opinion). In the Bail Reform Act of 1966, Congress struck the balance and determined that the risk of flight would be tolerated so long as there remained a reasonable assurance that the defendant would appear for trial. 18 U.S.C. § 3146. Similarly, there is always the risk that a criminal defendant free on bail may be endeavoring to obstruct or disrupt the trial proceedings. However, before a trial court undertakes to revoke a defendant's bond in order to protect the trial proceedings, there must be objective evidence of such a nefarious scheme. *See generally United States v. Bentvena,* 288 F.2d 442 (2d Cir. 1961); *Carbo v. United States,* 288 F.2d 282, 286–87 (9th Cir. 1961); *Carbo v. United States,* 288 F.2d 686, 689–90 (9th Cir. 1961) (affirming trial court decision on remand).

**B.** *The Respective Burdens*

To state that there must be a reasonable assurance that the defendant will appear for trial and, if convicted, for sentencing or that there must be objective evidence of efforts to impede the trial begs the question: On whom do these burdens lie and how high are they?

■ With respect to the question of flight, it is clear that *after* trial, the burden rests with the convicted defendant to demonstrate that he or she will not flee. Rule 46(c) of the Federal Rules of Criminal Procedure and Rule 9(c) of the Federal Rules of Appellate Procedure. *See also United States v. Provenzano,* 605 F.2d 85, 94–95 (3d Cir. 1979); *United States v. Miranda,* 442 F.Supp. 786, 792 (S.D.Fla.1977). On the other hand, *before* trial the wording of 18 U.S.C. § 3146 implies that there is a pre-

---

5. As amended in 1972, Rule 46(b) provides:
(b) *Release During Trial:* A person released before trial shall continue on release during trial under the same terms and conditions as were previously imposed unless the court determines that other terms and conditions or

termination of release are necessary to assure his presence during the trial or to assure that his conduct will not obstruct the orderly and expeditious progress of the trial.
The court has found no reported case interpreting this recent provision.

sumption in favor of the defendant's release on bail.[6]

The question of which party must bear the burden on the question of possible flight *during* trial appears to be unsettled. Unlike Rule 46(c), Rule 46(b) does not place this burden on the defendant. This Court is mindful that:

> The public interest in efficient criminal prosecution becomes more pressing once a defendant goes to trial. The investment of public funds in a trial, the impanelling of a jury, and the gathering of witnesses demand that precautions be taken to ensure that the proceedings go forward and terminate with all possible dispatch consistent with due process. . . . [T]he dangers of releasing a defendant on bail during the course of a trial are substantially greater than those existing before trial. For these reasons, trial courts have often exercised the power to remand a defendant into custody during the trial in the exercise of sound discretion.

*United States v. Bentvena,* 288 F.2d at 444; *accord, Carbo v. United States,* 288 F.2d at 285. Nevertheless, the fundamental nature of the right to bail continues during trial and therefore the government must bear the burden of persuading the Court that there is a need to alter previously set conditions for bail to forestall a defendant's flight. Similarly, the government must bear the burden of persuasion on alleged plans by a defendant to disrupt the trial proceedings.

█ The government's burden of persuasion certainly need not amount to proof beyond a reasonable doubt that the defendant will flee or that the defendant is preparing to disrupt the proceedings. Bond revocation proceedings are not to become mini-trials of subsequent charges.

Relying on the analogous provisions of 18 U.S.C. § 3146, the Court concludes that, in a bond revocation proceeding during a trial, the government must demonstrate by the

totality of the circumstances in the case and the evidence adduced in the bond hearing that there is no reasonable assurance that the defendant will continue to appear for trial and at sentencing if convicted. With respect to allegations of plans to disrupt the trial proceedings, again the Court must be reasonably persuaded from the totality of circumstances and evidence that the defendant has planned to or will disrupt the proceedings. *See Carbo v. United States,* 282 F.2d at 689 (the trial court's fear for witness' safety need only be "reasonable.")

### C. *Pertinent Factors to be Considered*

The totality of the circumstances in a case and the evidence adduced in the bond hearing may include a number of particularly pertinent factors, factors which differ for the issues of flight and disruption.

#### 1. *Flight*

█ The Bail Reform Act of 1966 lists an extensive number of factors which are presumptively relevant on the issue of possible flight. *See* 18 U.S.C. § 3146(b). Before turning to these factors, the Court notes that the factors listed in 18 U.S.C. § 3146 are not exhaustive. Rather, these factors are all a court normally has before it in determining bail.

Perhaps more persuasive than any single other factor that could be brought to a court's attention would be the defendant's expressed intention to flee the particular proceedings then being conducted. All of the factors listed in 18 U.S.C. § 3146(b) are designed to enable a court to predict from objective manifestations whether the defendant intends to flee. It is inconceivable that a court could not consider as highly pertinent and persuasive a clear statement by the defendant that he intends to flee, the very matter the court must predict.

The various factors which 18 U.S.C. § 3146(b) requires to be considered in a pretrial bail hearing ought to be considered

---

6. The mandatory language of 18 U.S.C. § 3146(a) states, in pertinent part:

> Any person charged with an offense, other than an offense punishable by death, *shall*

> . . . be ordered released pending trial
> . . . .

(emphasis added).

also in a mid-trial bail hearing. *Cf. United States v. Miranda,* 442 F.Supp. at 789 (bail after conviction is determined, in part, by looking at the same concerns listed in 18 U.S.C. § 3146(b)). These factors include:

(a) the nature and circumstances of the offense charged;

(b) the weight of the evidence against the accused;

(c) the accused's family ties, employment, financial resources, character and mental condition;

(d) the length of his residence in the community;

(e) his record of convictions;

(f) his record of appearance at court proceedings or of flight to avoid prosecution or failure to appear at court proceedings.

Of course, after three months of trial in this case, the Court has a great deal more data on factors (a) and (b) than would be available at any pre-trial bond proceeding. Accordingly, those two factors may be given substantial weight although they should not be solely determinative. *See United States v. Allison,* 414 F.2d 407, 412–14 (9th Cir. 1969).

The three months of trial in this case have also provided the Court with stark examples of the propensity of defendants to flee. After several weeks of trial, one defendant fled this jurisdiction. Just a short while later, a second defendant violated the terms of his bail, landed himself in jail on Aruba, and eluded United States officials once he was released from the Aruban jail. The Court can only assume at this point that this second defendant is also a fugitive. While these actions by co-defendants do not prove that other defendants necessarily intend to flee, they do make vividly clear the substantial risk that defendants charged with these crimes find it expedient to flee.

2. *Disruption*

Unlike the issue of possible flight, Congress has passed no statute which enumerates factors to be considered when it is contended that bail must be revoked to protect the integrity of the court's proceedings. The Bail Reform Act of 1966 was not an all-encompassing statute. In particular, it did not strip courts of their extrastatutory power to protect the integrity of their proceedings. *See United States v. Wind,* 527 F.2d 672 (6th Cir. 1975); *Bitter v. United States,* 389 U.S. 15, 16–17, 88 S.Ct. 6, 7, 19 L.Ed.2d 15 (1967) (recognition of extrastatutory power in an opinion written after passage of Bail Reform Act). In contrast, Rule 46(b) explicitly recognizes this extrastatutory power, although it also fails to enumerate the factors a court should consider when trial disruption is alleged.

■ The determination that the revocation of a defendant's bail is necessary to protect the trial from disruption is a matter within the special competence of the trial court. *See Fernandez v. United States,* 81 S.Ct. at 645 (1961); *Bitter v. United States,* 389 U.S. at 16, 88 S.Ct. at 7 ("A trial judge indisputably has broad powers to ensure the orderly and expeditious progress of a trial.") In making its determination, the trial court should be circumspect and it may not revoke a defendant's bond merely to suit its own convenience. *See Bitter v. United States,* 389 U.S. 15, 88 S.Ct. 6, *reversing United States v. Bitter,* 374 F.2d 744 (7th Cir. 1967); *United States v. Bentvena,* 288 F.2d at 445.

■ Of the numerous factors to be weighed by the trial court, five are of primary importance. First, the court should review the trial proceedings to ascertain whether the particular defendant might have a motive to disrupt those proceedings. Often, the strength of the government's case against the defendant or codefendants and the possible sentences which could be meted out upon conviction may provide the requisite motive. Second, the court should carefully weigh all of the evidence which would indicate that the particular defendant does or does not intend to disrupt the proceedings. In this inquiry the court is not bound by the formal rules of evidence. *See* 18 U.S.C. § 3146(f). Third, the court may wish to consider whether the evidence against the particular defendant fits within

a pattern of conduct by a number of defendants. *United States v. Bentvena,* 288 F.2d at 446–47. Fourth, the court should weigh the possible prejudicial effect which any disruption of the trial might have upon other defendants or the administration of justice. Finally, a trial court should consider whether any restrictions short of bail revocation would be effective to prevent potential disturbances. *United States v. Bentvena,* 288 F.2d at 445.

Plainly, the trial court's decision must be informed by its understanding of the practical necessities of trial management. The situation in the *Bentvena* case, so often cited in this order, is particularly instructive. In that case, the district court was presiding over a lengthy trial of nineteen defendants charged with violating the narcotics laws. Trial had begun on November 21, a week late because of the disappearance of a defendant. Thereafter, trial was interrupted repeatedly by the illnesses of various defendants. It was further delayed on January 25 by the injury of a defendant in a traffic accident under suspicious circumstances. Although the trial court was most concerned about the delays in the trial, the defendants had also threatened witnesses and there were allegations of witness-tampering. By the end of January, the government had not yet concluded its case and the jury panel was already depleted, with only two alternates remaining. At that point that trial court ordered all of the defendants remanded to custody to prevent further delays in the proceedings. In a persuasive opinion, the Second Circuit unanimously upheld the trial court's action, *United States v. Bentvena,* 288 F.2d 442 (2d Cir. 1961), and Justice Harlan, sitting as

Circuit Justice, declined to grant interim relief, *Fernandez v. United States,* 88 S.Ct. 642, 5 L.Ed.2d 683 (1961).

The practical parallels between *Bentvena* and the instant matter are notable. As in *Bentvena,* this Court is making every effort to provide the defendants with a fair trial in a lengthy and complex criminal case. As in *Bentvena,* some defendants in this case have fled. As in *Bentvena,* the Court finds its jury panel depleted. Indeed, in this case only a single alternate juror remains on the panel, two having been excused for causes attributable to the alleged misconduct of several defendants.

In one respect, the two cases differ. Whereas in *Bentvena* the primary alleged misconduct of the defendants entailed disruptive absences from trial, in this case the alleged misconduct includes plans to bribe a juror, plans to assassinate a prosecution witness, and plans to remove the judge involuntarily.[7] This distinction can only militate in favor of the revocation of bail if the evidence warrants such action.

### III. *The Facts*

#### A. *Introduction: Defendants Randall Fisher and Lynne Platshorn*

The evaluation of the evidence introduced at the bond hearings is a delicate process. As noted above, criminal charges have been brought as a result of this evidence; several of the defendants will later stand trial on precisely the issues raised at the bond hearings. This Court must be wary of prejudicing those later trials. In the present proceedings, the Government need not meet the burden of proof which it will face at the trial. As a result, the Court may reach

---

7. For example, when Special FBI Agent Ronald Reese was asked on cross-examination to list the various plans discussed by several defendants for trial disruption, he responded:

THE WITNESS: Well, sir, during the meetings that I am aware of and had recordings of, they were talking about tampering with the witnesses, disrupting the trial through intimidating the witnesses, and involuntary removal of the judge, and paying jurors.
THE COURT: Those are kind of interesting words. What does "involuntary removal of the judge" mean?

THE WITNESS: I took it to mean killing the judge, sir.
MR. SHERES: I request that be stricken.
THE COURT: Denied.
Transcript at 7028–29. The Court would note its belief that, in fact, Mr. Brodsky made the motion to strike. Special Agent Reese's testimony quoted above is not the government's sole basis for its allegations that the defendants planned to disrupt the trial. As set out below, the record is replete with such evidence.

conclusions here without determining the merits of the criminal charges. Nothing which follows should be taken as an expression of the Court's opinion on the merits of Indictments # 2 and # 3.

Given that prefatory statement, the Court can only conclude that the evidence overwhelmingly shows that defendants Lynne Platshorn and Randall Fisher were planning to disrupt the present trial. The evidence introduced by the Government at the bond hearings included a series of tape-recorded conversations between those two defendants and a confidential informant, Charles Coveney. Those recordings supply inescapable inferences.

Randall Fisher met with Charles Coveney on November 27, 1979 and matter-of-factly discussed his plans to buy the vote of a juror. Gov. Ex. IV. The detail with which Fisher described his plans can leave no doubt as to their seriousness. He discussed the middlemen involved, *id.* at 162, 207,[8] how the juror was to be paid, *id.* at 208, 408, how many of the defendants the juror would vote for, *id.* at 359, a plan for obtaining the juror's name, *id.* at 506, and plans for assuring the juror's cooperation, *id.* at 490. Lynne Platshorn's conversations with Charles Coveney are similarly distinct. Although the implementation of her plans was not specified, she clearly hired Coveney with the intent of causing a mistrial. Gov. Ex., I, II, IIIA, IIIB, VII. The details of their plans and the payment for them abound; particularly ominous in its overtones is the following comment by Lynne Platshorn made on November 26, 1979:

> And when I found out Gene's thing was with the jury too, I kinda let it go. Because as long as he's not out to murder the judge, it isn't gonna interfere with us.

Gov. Ex. IIIB at 77–79.

■ Were these the plans of defendants working secretly, in isolation, perhaps they would be irrelevant to the present motions. But the evidence is clear that these efforts were collegial, if not conspiratorial. As indicated by the Second Circuit's decision in *United States v. Bentvena,* a court may consider a pattern of conduct by a group of defendants in analyzing the application of any individual for bail. Here the pattern is clear, and the specific circumstances of defendants Myers and Grant, discussed below, must be viewed in that light.

Randall Fisher's conversation with Charles Coveney reveals that his plan was discussed with the other defendants:

> I had asked Lynne first, and she said, "No, there's no way." I says fine and so I went elsewhere and now they're workin' for it. Ah, Bob and (unintelligible); the couple guys who are in this, they jumped at it right away and said, "Fine, go right ahead." And I had asked Bob over the table, I says, "Is there any money for us to get a hold of this?" And then after everybody else finds out that it is true, and we got her signals in the courtroom and everything, now everyone wants in.

Gov. Ex. IV at 163. Indeed, it appears that the discussions took place in the courtroom. "Bob" (Robert Platshorn) has been incarcerated since early September, and Fisher could only have spoken with him there. Further, when Coveney asks Fisher about Lynne Platshorn's apparent misunderstanding of the details of his plan, Fisher replies:

> See, she isn't there. She isn't in on all the conversations and everything like this between the guys involved here. And, you know, *everyone knew just what it was,* but no one said anything, you know. And so she just picked some pieces up.

*Id.* at 222 (emphasis added).

While Lynne Platshorn never expressly states that she discussed her plans with

---

**8.** Citations to the tape recorded conversations are made in the following manner. Government Exhibits I and IV were provided to the court on tape reels. They were played on a Sony TC-270 tape recorder, and the citations are to the digital counter on that machine. Exhibits II, IIIA, IIIB, VII, VIII, and IX were provided on tape cassettes. They were played on a Superscope C-105 tape recorder, and the citations are to the digital counter on that machine. On all tapes except Exhibit IV, the counter was set at zero upon the first audible sound made by Lynne Platshorn. The counter was set at zero for Exhibit IV upon the first spoken word.

everyone, she refers to discussions regarding disruption she had with each of the defendants still present, with the exception of Modesto Echezarreta. Gov. Ex. II at 32 (discussions with Myers and Fisher); Gov. Ex. IIIB at 47 (with Myers); Gov. Ex. VII at 72–175 (with Grant); Gov. Ex. II at 22 (intended discussion with Robert Platshorn and Robert Meinster). The conclusion is inescapable that disrupting the trial was a common subject of conversation. In construing the evidence on Myers and Grant, this must be kept in mind.

The conclusions reached in this order are not based merely on the few quoted portions of conversations. As the discussions above make clear, those portions cannot be construed accurately without reference to the activity of all the defendants. The tapes in their entirety have been repeatedly reviewed. Indeed, the court's decision also rests, to a certain extent, on the evidence it has heard over the past three months. Justice Harlan concluded that he would only overturn a trial judge's revocation of bond during trial upon concluding that the action had been arbitrary and capricious. He reached that conclusion, in part, because he could not "possibly have the same full 'feel' of the atmosphere of this more that three months trial that the trial judge possesses." *Fernandez v. United States,* 81 S.Ct. at 645. The Second Circuit similarly noted that the trial judge's exposure to the defendants placed him in an unique position to evaluate the requests for bond. *United States v. Bentvena,* 288 F.2d at 446. The conclusions reached below are derived from the 9,000 page record in this case and from the court's observations during trial of the persons involved and their interrelationships.

### B. *Defendant Eugene Myers*

The government asserts that Eugene Myers should be denied bond because the evidence indicates he was planning to disrupt the trial or to flee the country if convicted. These assertions are supported by tape recordings between a confidential informant and two other defendants, and on the testimony of James Driggers.

Myers was not named in either of the indictments resulting from this evidence.

Myers responded to these charges at the bond hearing by testifying that he had no plans to disrupt the trial, that indeed he had demonstrated his willingness to cooperate in the investigation of the attempts to disrupt it. The credibility of the witness Driggers, whose testimony provided the basis for the allegations of intention to flee, was also attacked.

■ All of the evidence on Myers, and his responses to it, will be discussed below. But as the legal analysis above illustrates, the court may look beyond the concrete evidence of actions and intentions. Motive is important. There is a statutory presumption in pretrial bail proceedings that the likelihood of flight increases with the severity of the charges, the strength of the government's case, and the penalty which conviction could bring. *See* 18 U.S.C. § 3146. Surely, a similar presumption is appropriate to bail proceedings during trial. The motivation to flee is affected by the government's case. One can hardly imagine a case providing a greater impetus than the government's case against Eugene Myers.

■ Eugene Myers is named in eight counts of the present indictment. Among the charges against him is that he engaged in a continuing criminal enterprise, in violation of 21 U.S.C. § 848. The maximum penalty for a conviction on that offense is life imprisonment. He faces an additional maximum of 64 years imprisonment on other charges. The government has presented a strong case on each count. While Myers and his counsel respond to these implications by noting his faithful appearances to date, this assertion is somewhat inapposite. The point to be made is that Myers' motivations must change. Past performance is some indication of future conduct, but as the likelihood of conviction increases, and as the date of judgment approaches, the likelihood of flight or disruptive action increases. In the present circumstances, including its knowledge of the defendant gained over months of testimony, the Court concludes

that Myers' motivation either to stave off or flee his conviction is quite high.

### 1) *Disruption*

The Government's allegations regarding Eugene Myers' attempts to disrupt the trial involve two separate matters: (1) his participation in Lynne Platshorn and Randall Fisher's scheme to buy the vote of a juror; and (2) his independent plans for disruption. These allegations rely heavily on the tape-recorded comments of Lynne Platshorn and Randall Fisher.

Throughout her conversations with Charles Coveney (the confidential informant), Lynne Platshorn discussed the plans of her codefendants. Coveney repeatedly requested such information so that he could be certain there would be no interference with his own plans. Gov.Ex. I at 30–37; 168–175. During the course of describing the plans initiated by Randall Fisher to bribe a juror, Lynne Platshorn indicated the role which she believed Myers was playing in the scheme.

At the outset, it is clear that Myers was aware of the scheme. Lynne Platshorn repeatedly referred to Myers' knowledge of and participation in the scheme. *E.g.*, Gov.Ex. I at 33–37; 54–60. Indeed, in his testimony at the bond hearing, Myers admitted discussing the scheme with Lynne Platshorn on November 21, 1979. Tr. at 8380.

Myers almost certainly knew of the plan before November 21. James Driggers testified to conversations he had with Myers in the courthouse in October. During the course of one such conversation, Myers commented that he was attempting to buy the vote of a black juror. Tr. at 8443. The crucial nexus between that comment and Fisher's plan is provided by Lynne Platshorn. She explained to Charles Coveney that in the early stages of the plan the subject was thought to be a black juror. Gov.Ex. I at 236. Her comment also provides corroboration for Driggers' testimony. Although he was attacked strongly by Myers' counsel, Driggers appeared credible to this Court. How, unless he heard it from the source he cited, did he gain the same understanding of the bribery scheme that Lynne Platshorn had? Driggers' testimony indicates that Myers was aware of the plan from the outset.

According to Lynne Platshorn, Myers was intimately involved in the bribery plan. It appears that he was supposed to provide the $5,000 initial payment to the juror:

> Coveney: What's goin' on with this juror thing again?
>
> Platshorn: Well, the other guy was supposed to come in with five today. Apparently there is some doubt as to whether or not he could get it.
>
> Coveney: And who was that?
>
> Platshorn: Gene.

Gov.Ex. II at 32; *see id.* 22, 52; Gov.Ex. IIIB at 100.

Driggers' testimony also indicates involvement. Myers asked him to be a go-between in the bribery attempt. Tr. at 8443. This request, however, was not followed by any further action. Myers attacked the credibility of this testimony by arguing, among other things, that it is unreasonable to believe that he would have made such an approach to someone he did not know. This request, however, occurred at Myers' third conversation with Driggers, Tr. at 8440–41, after the defendants, Driggers theorized on cross-examination, had taken the opportunity to check-out his trustworthiness with his former jail-mates. Tr. at 8462–63. In any event, this Court has concluded that Driggers' testimony was credible, and that his allegations were not made for the purpose of securing monetary gain.

Lynne Platshorn's conversations also reveal what she knew of Myers' independent plans. She stated on November 26, that "Gene's not gonna' give him the five, because Gene's workin' on something with his own people." Gov.Ex. IIIA at 56. She went into greater detail as follows:

> So I said to him, "Tell me what it is." He said, "It's similar." I said, "You mean with the jury." He said, "My people have something going with a couple of jurors that'll cover everybody. Now this

one, first it was Greg, Randy and Chip, and now they threw me in and Greg is no longer in the trial. And it's extra for everybody. And we're negotiating with a couple of jurors," he would not tell me who, whether it's 2 or 3, and he didn't tell me what the price was. But he said, "My people are negotiating."

Gov.Ex. IIIB at 48. There are numerous other references to comments made by Myers to Platshorn. *See* Id. at 100; Gov.Ex. IX at 97; Gov.Ex. I at 509. Lynne Platshorn is apparently not the only person who believed in Myers' plans. Randall Fisher commented that he had already warned Myers not to let his plans interfere with Fisher's. Gov.Ex. IV at 561.

Eugene Myers offers little in the way of explanation for the inferences which must be drawn from the tape recordings. He denies ever involving himself in Lynne Platshorn's plans with Charles Coveney, and the evidence appears to support his position. But the conversations with him, as related in the tape recordings, stand without contradiction. He offers no theory or evidence to explain why two of his codefendants believed he was planning means of disrupting the trial. Similarly, he fails to explain his apparent involvement in Randall Fisher's bribery scheme. Myers claims never to have discussed disruption with Lynne Platshorn prior to November 21, and claims that he never did more than warn her of the potential dangers of such a scheme. That explanation is simply insufficient to resolve in his favor the very strong inferences from the tape recordings.

Myers and his counsel rely heavily on his recent cooperation with the government. The government has stipulated that Myers' counsel reported on December 4, 1979 that Lynne Platshorn was involved in a plan to obstruct justice. It was argued that this indicated his lack of intent to disrupt. The extent and cause of his cooperation, however, is questionable. The Government has argued that Myers' decision to cooperate directly resulted from his conclusion that Coveney was an informant. Tr. at 8497–500. Moreover, the government noted that

the cooperation has only been sufficient to disassociate Myers from the Platshorn-Coveney plan.

This matter need not be addressed at great length. Myers' cooperation, although eliminating any chance that the Platshorn-Coveney plan might succeed, does not explain his apparent involvement in other schemes. The evidence of that involvement is sufficient to convince this Court that he intended to and was taking action toward disrupting the trial.

### 2) Flight

The evidence on the issue of flight is considerably less complex. James Driggers testified that in the course of discussing the jury bribery schemes with Myers and Grant

they said they had their arrangements taken care of and they were doing this for the other defendants, and if it looked like they were going to be convicted, they had arrangements to flee the country.

Tr. at 844. Myers' response is to deny having made such a statement, and to attack the credibility of Driggers.

The credibility of Driggers has been discussed above; his testimony on other matters was corroborated. Myers' assertion that Driggers' testimony is motivated by a desire for Government payment is unpersuasive. Driggers testified on cross-examination that at the time he offered testimony he was employed, unaware of the potential for economic gain through his cooperation, and had not discussed the witness protection program. The court's observation of Driggers' demeanor on the stand further supports his credibility. The totality of the circumstances, particularly the defendant's high motivation to flee, indicates that any restraint short of incarceration would render Eugene Myers' continued presence at the trial unlikely.

### C. Defendant Richard Elliot Grant

In the December 6 hearing before this Court, the government moved to revoke the bond of defendant Grant even though he was not charged in either Indictment # 2 or # 3. The evidence presented by the

government in support of its motion for revocation of bond clearly supports revocation. The tape recorded conversations of Charles Coveney with Lynne Platshorn and Randall Fisher and the testimony of James Driggers vividly illustrate that Grant was involved in two schemes to disrupt the proceedings in this case and intended to flee should convictions become imminent. That evidence, taken in conjunction with the proceedings which have occurred in trial thus far, compel this Court to revoke the bond of defendant Grant. For the reasons set forth below, this Court finds the risk of disruption and flight by defendant Grant so great, that his right to remain free pending an adjudication of guilt must be subordinated to the need for the orderly administration of justice in this case.

1. *Disruption*

The government has presented evidence of Grant's involvement in two schemes to disrupt the proceedings in this case. The first scheme involves the employment of an individual to kill George Purvis, a government witness. A detailed explanation of this plot was related by Lynne Platshorn in a telephone conversation with Charles Coveney on November 27, 1979. Gov.Ex. VII at 70.

Coveney: What did this guy Chip [Defendant Grant] have to say?

Platshorn: Oh, O.K. The guy I was taking about . . .

C: Yeah.

P: You remember when Carmine Galante got blown away in a restaurant?

C: Yeah.

P: Well supposedly, uh . . . let me put it this way . . . he drove a man to the airport and the next day it was on the TV news that Galante got blown away, and the dude came back the day after. Uh, his business, oh and his, his example to me was that he mentioned this man's business associate to Gene Myers. And Gene said "How the hell do you know these people?" His business associate's name is Benedetto. Does that mean anything to you?

C: From where?

P: New York. Let me put it this way. Do you know who blew Galante away?

C: No.

P: Well, it's Benedetto's associate.

C: What is Chip . . .

P: But he wouldn't give me the guy's name.

C: How does Chip get to a guy like that?

P: His father was in the milk business in New York during the days of Lucky Legs Diamond. They tried to shake his old man down to pay off for the milk business. And he climbed into (unintelligible), put a gun to Lucky Legs and got away with it and they decided that the dude was, you know, good people. And through, through Diamond he met all these people. And when Chip got in trouble, this professional man, he came down . . .

C: He's supposed to be here now?

P: Yes, he is here now.

C: Did you meet him?

P: No. (Unintelligible) He said, let me put it this way, he's associated or his assistant is a man named Benedetto. Gene Myers apparently knew the name and said "Where do you come off knowing these people?" and Chip laughed and I said "Who is the guy, what's his name? He said "I won't tell you his name, but let me put it this way. Do you remember the man who was shot in the New York restaurant?" And I said "Galante?" And he said "Yes."

C: Are you sure they're not, that he's not just saying this to psyche you up?

P: I don't think so.

C: What actually did he say? He's got a guy down here now?

P: He took the man to the airport the day before Gallante was shot and picked him up the day after.

C: Who did?

P: Chip.

C: Chip drive a guy . . .

P: Drove a guy to the airport.

C: From Miami?

P: Yeah, when he's not working he visits Miami and Palm Springs. Cause of . . .

C: So the guy lives down here?

P: No, he vacations down here—he's from New York. But I figured Joe oughta know who hit Galante and he oughta know who Benedetto is. Gene know who he was, Benedetto. I don't.

C: Alright, so what are they looking for, they're looking to . . .

P: They want (unintelligible) to blow away Purvis. And I told Chip "That won't do any good. That'll do us more harm than good." And he said "They can't walk in there and say the man was blown away, all they can do is walk in Monday and say the Man's not going to testify any further."

C: How does this guy expect to do this? Wave a magic wand or something and
. . . .

P: No, he's supposed to shoot him with a gun that goes, travels at 6700 feet per second and has an impact of 12 tons and, you know, while he's walking into the courthouse building with the marshals. And I said "Chip you can't do that. First of all, the man's not going to do it for charity. And Chip said "Well I figured if we talked to everybody, between all of us we could come up with thirty." I said "Forget it and please don't do it cause you'll do us more harm than good."

The second disruption scheme in which Grant was allegedly involved was the jury tampering plan devised by Randall Fisher. In statements to Coveney during their November 27 meeting, Fisher clearly indicates that Grant was aware of the plan to influence the vote of a juror. Fisher told Coveney that once the other defendants knew that the plan was viable all the defendants "wanted in" and encouraged him to proceed with his plans. Gov.Ex. IV at 163. The testimony of James Driggers also supports the contention that Grant was involved in the purported jury scheme. Driggers testified that at a meeting among himself, Myers and Grant, Myers stated that "they" were in the process of buying the vote of a juror. Tr. at 8442. The existence of this scheme is corroborated by Lynne Platshorn in two conversations with Coveney. Gov.Ex. III A at 57; III B at 50.

In response to the evidence concerning the plot to murder Purvis, Grant's counsel argued that Lynne Platshorn fabricated the plan in order to gain bargaining power with Charles Coveney. According to this theory, Lynne Platshorn could strike a better bargain if Coveney knew that his activities were not her only chance for disruption of the trial. This theory falls short of negating the plausibility of Grant's scheme to murder Purvis for several reasons.

First, the murder of Purvis would not necessarily cause a mistrial, especially if the murder was carried out as suggested by Lynne Platshorn's rendition of the plan. If the murder did occur outside the courthouse and out of the presence of the jury, the need for declaring a mistrial could be obviated with precautions designed to prevent the jury from learning of the incident. Additionally, both Lynne Platshorn and Coveney viewed Grant's alleged plans as an obstacle to their own alleged plans. Coveney, throughout all his conversations with both Lynne Platshorn and Fisher, expressed grave concern over Grant's plan and how it might interfere with their own. If anything, Lynne Platshorn should have denied knowledge of the plan. She wanted Coveney to act as soon as possible, but Coveney refused to proceed until everyone's plans were coordinated.

The language used by Lynne Platshorn to relate the plot to Coveney also contradicts the arguments on Grant's behalf. When Coveney inquired as to how the murder was to be accomplished, Lynne Platshorn replied ". . . he's supposed to shoot him with a gun that goes, travels at 6700 feet per second and has an impact of 12 tons." Unless Lynne Platshorn is extremely familiar with firearms, she would not have described the gun in this fashion, unless she was simply repeating what someone had related to her. It has never come to the Court's attention that Lynne Platshorn has any knowledge concerning firearms. Yet, the record in this case is replete with testimony on Grant's interest and expertise in firearms. The only logical explanation for the description by Lynne Platshorn is that she was simply repeating, perhaps incorrectly, what "Chip" Grant told her.

With respect to Drigger's testimony, counsel for Grant essentially denies that Driggers can be believed. This argument fails. As discussed above, the testimony of Driggers, at least with respect to the jury tampering scheme, is fully corroborated by Lynne Platshorn's statements to Charles Coveney.

The evidence of Grant's involvement in plans designed to disrupt this trial is credible. Possible motives are apparent. Where Purvis is concerned, Grant could want revenge.[9] With respect to the jury tampering schemes he probably sought to forestall the possibility of conviction for as long as possible. Furthermore, Grant's activities appear to be only a part of a pattern of activities discussed and planned by all the defendants in this case. In light of the foregoing findings and conclusions, it is clear to this Court that no restrictions short of revocation of Grant's bond will assure that this trial will proceed in an orderly and judicious fashion.

2) *Flight*

In addition to his involvement in at least two disruption schemes, the government presented evidence that Grant will flee should conviction become imminent. Driggers testified that in the conversation in which Myers and Grant proposed that he cooperate in the alleged jury tampering plan, Myers related his and Grant's intention to flee. Tr. at 8441. Drigger testified as follows:

Q. Who participated in this conversation back and forth?

A. Myself and No. 1 [Grant] and No. 2 [Myers].

Q. Was there anyone else present?

A. No, sir. There were other people in the courtroom, but no one was where we were at. There was a recess and lawyers were meeting over here.

Q. Did you have any further conversations with No. 1 and No. 2?

A. We finished the conversation that day. The only other thing was they were explaining to me why they were doing, going to buy—they said they had their arrangements taken care of and they were doing this for the other defendants, and if it looked like they were going to be convicted, they had arrangements to flee the country.

Q. Who said that?

A. That was No. 2.

Q. Was there anything else to that conversation?

A. No. That was pretty much it.

In opposition to the evidence presented by the government on Grant's alleged intention to flee, Grant's counsel presented the testimony of Grant's parents and a bail bondsman. Tr. at 8349, 8358, 8368. The purpose of the testimony was to demonstrate Grant's family ties and employment in the community. In further support of Grant's intention to remain in this jurisdiction and appear as required, counsel argued that Grant has always appeared as required in these proceedings in the past.

Under the circumstances of this case, counsel's arguments and the evidence presented are simply not persuasive. The evidence presented during the trial of this matter, clearly implicates Grant in the Meinster-Platshorn drug operations. The likelihood of conviction seems great at this point and if convicted of all counts charged, Grant could be sentenced to serve prison terms of life imprisonment and 65 years. In the face of these circumstances family and employment ties do not merit great weight.

It is true that Grant's bond is presently secured by his parent's house and there was testimony that Grant would do nothing to harm his parents. However, that fact alone does not assure this Court that Grant will continue to appear as required. Grant's employment ties in the community are of

---

9. It must also be noted that Grant's alleged plan to kill Purvis is supported by the evidence presented thus far at trial. Purvis testified that Grant had threatened to kill him should he testify against Grant in any judicial proceeding. Although the testimony indicates no overt acts taken by Grant to fulfill this threat, the murder plot is certainly consistent with these prior threats.

little consequence. He is an independent contractor and could practice his trade anywhere. Likewise, his past appearances are not significant. The need to flee does not arise until incarceration is about to occur, that is, at the time of conviction. This trial was originally scheduled for approximately a six month period. Appearance during the first three months is not indicative of the defendant's intention not to flee when the likelihood of conviction is great and the time for incarceration is nigh.

This Court finds that in light of the circumstances of this case the government has presented evidence sufficient to establish Grant's intention to flee. The Court further finds that no restrictions short of revocation of bond will reasonably assure his appearance at this trial.

IV. *Conclusion*

The progress of this trial has been marked by numerous extraordinary events, creating a rather persuasive pattern. Immediately prior to trial, the bond of two defendants was revoked when it was shown they were planning to import massive quantities of narcotics and to flee the country. Two more defendants have disappeared during the course of the trial, and although their exact whereabouts remain unknown, they are considered fugitives. The most recent indictments indicate further steps in an on-going effort to avoid prosecution.

Vast expenditures of time and money have been necessary to bring this trial through the past three months. This Court and District have been burdened by the shifts in caseload necessary to accommodate these proceedings. To begin again, as would surely have been necessary had some of the plans discussed above succeeded, would compound these difficulties. The fair administration of justice to all litigants in the Southern District of Florida requires that the trial proceed in as orderly a manner as possible.

On the evidence now before the Court,[10] it is reasonable to conclude that the defendants Myers and Grant were involved in schemes to disrupt the trial and, if necessary, to flee. These plans were formulated while the defendants were on bail; indeed, some of the planning has purportedly taken place in the most controlled circumstances imaginable: in the courtroom during trial recesses. It is apparent that no measures short of incarceration will assure the orderly progress of this trial or the continued presence of the defendants. It is therefore

ORDERED and ADJUDGED that Eugene Myers' motion for reinstatement of bail is denied. It is further

ORDERED and ADJUDGED that Richard Grant's motion for reinstatement of bail is denied.

DONE and ORDERED in chambers at Miami, Florida, this 28th day of December 1979.

---

10. On December 27, 1979, after this order had been prepared, defendant Myers moved the Court to consider further evidence he hoped would be produced as the result of an expected plea bargain by a defendant named in Indictment # 3. It would be improper to attempt to speculate on the possible effect of as yet non-existent evidence. If such exculpating evidence with respect to defendant Myers is indeed forthcoming, then defendant Myers may move for reconsideration upon the new evidence.